Snell & Wilmer L.L.P.
Keith M. Gregory, Bar No. 117837
kgregory@swlaw.com
Aliya L. Astaphan, Bar No. 340162
aastaphan@swlaw.com
City National 2CAL
350 South Grand Avenue, Suite 3100
Los Angeles, California 90071-3420
Telephone: 213.929.2500
Facsimile: 213.929.2525

Attorney for Plaintiffs
Eyeon Investments Pty. Ltd. and Northrock
Capital Pty Ltd. on behalf of Aspire
Technologies, LLC, Arrears, Inc. and AI
Unlimited Group, Inc. and Eyeon Investments
Pty Ltd directly

# IN THE UNITED STATES DISTRICT COURT

# FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| EYEON INVESTMENTS PTY LTD and NORTHROCK CAPITAL PTY LTD, on behalf of ASPIRE TECHNOLOGIES, LLC, ARREARS, INC. and AI UNLIMITED GROUP, INC., and EYEON INVESTMENTS PTY LTD, directly,<br><br>Plaintiffs,<br><br>v.<br><br>TRENT MCKENDRICK, an individual, TJM CAPITAL, LLC,<br><br>Defendants. | Case No. 2:25-cv-11326<br><br>**Shareholder Derivative and Direct Complaint For:**<br><br>**(1) Breach of Fiduciary Duty**<br>**(2) Conversion**<br>**(3) Fraud**<br>**(4) Negligent Misrepresentation**<br><br>Complaint Filed:<br>Trial Date: |

Plaintiffs Eyeon Investments Pty Ltd ("Eyeon") and Northrock Capital Pty Ltd ("Northrock"), on behalf of Aspire Technologies, LLC, Arrears, Inc. and AI Unlimited Group, Inc., ("Plaintiffs") and directly for Eyeon ("Direct Plaintiffs") allege as follows:

///

# INTRODUCTION

1. This is a shareholder derivative action being brought against Trent McKendrick ("McKendrick" and TJM Capital, LLC ("TJM Capital," collectively with McKendrick, "Defendants") arising out of Defendants' breaches of fiduciary duty and conversion. This is also a direct action being brought by Eyeon directly against McKendrick for fraud and negligent misrepresentation. McKendrick is a con man.

# PARTIES

2. Eyeon Investments Pty Ltd is, and at all times herein mentioned was, an Australian proprietary limited company established on April 10, 2022, with its principal place of business in Shepparton, Victoria, Australia. Eyeon holds the following amount of interest in Aspire Technologies, LLC, Arrears, Inc., and AI Unlimited Group, Inc.:

    (a) Aspire Technologies LLC: Paid AU $7,252,408 for 23,142,690 units.

    (b) Arrears, Inc.: Paid AU $1,933,333 for 2,777,767 shares

    (c) AI Unlimited Group, Inc.: Paid AU $6,439,355 for 100,554,809 shares

3. Northrock is, and at all times herein mentioned was, an Australian proprietary limited company established on November 10, 1989, with its principal place of business in Shepparton, Victoria, Australia. Northrock holds the following amount of interest in Aspire Technologies, LLC, Arrears, Inc., and AI Unlimited Group, Inc.:

    (a) Aspire Technologies LLC: Paid AU $1,515,902 for 1,948,505 units.

    (b) Arrears, Inc.: Paid AU $271,063 for 516,923 shares

    (c) AI Unlimited Group, Inc.: Paid AU $ 899,278 for 1,892,719 shares

4. Aspire Technologies, LLC ("Aspire") is, and at all times herein mentioned was, a Nevada limited liability company formed on April 11, 2022. Aspire's status as an active Nevada limited liability company was revoked by the Nevada Secretary of State on February 6, 2025, and subsequently reinstated on

1  November 12, 2025. Aspire's principal place of business was, and currently is, in Los Angeles, California.

2  5. Arrears, Inc.("Arrears") is, and at all times herein mentioned was, a Delaware corporation formed on September 7, 2022, under the name of Resolve Debt, Inc. A Certificate of Amendment of Certificate of Incorporation was filed on July 19, 2024, changing the company's name to Arrears, Inc. Arrears' principal place of business was, and currently is, in Los Angeles, California.

6. AI Unlimited Group, Inc. ("AIUG") is, and at all times herein mentioned was, a Delaware corporation formed on March 24, 2022, under the name of Lever Global Corporation. A Certificate of Amendment of Certificate of Incorporation was filed on March 19, 2024, changing the company name to AI Unlimited Group, Inc. AIUG is a publicly traded company with its stock currently traded on the Over-the-Counter Exchange ("OTC"). AIUG's principal place of business was, and currently is, in Los Angeles, California.

7. Plaintiffs are informed and believe, on that basis allege that defendant McKendrick is, and at all times herein mentioned was, and is at all times herein mentioned was, domiciled in the State of California.

8. Defendant TJM Capital is, and at all times herein mentioned, a Wyoming limited liability company with its principal place of business in Los Angeles, California. Plaintiffs are informed and believe and upon that ground allege that the sole member of TJM Capital is McKendrick, who is domiciled in the State of California.

**JURISDICTION AND VENUE**

9. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1332, as the amount in controversy exceeds $75,000, exclusive of interest and costs, and diversity of citizenship exists between the parties. This Court has personal jurisdiction over TJM Capital because it conducts a substantial amount of business in the State of California and because Plaintiff is informed and believes, and

1  on that basis alleges, that it is a citizen of the State of California. This Court has
2  personal jurisdiction over McKendrick because he is domiciled in the State of
3  California, and he conducts a substantial amount of business within the State of
4  California. Further, a substantial amount of the conduct complained of herein
5  occurred within the State of California.

6      10.    Venue is proper in this Court, pursuant to 28 U.S.C. § 1391, as
7  McKendrick is a resident of Los Angeles, California and because TJM Capital's
8  principal place of business is in Los Angles, California and it is subject to this Court's
9  personal jurisdiction. Venue is also proper because a substantial part of the events
10 giving rise to Plaintiffs' claims occurred in Los Angeles, California.

## GENERAL ALLEGATIONS

11.    Plaintiffs incorporate by reference each and every allegation contained in the preceding paragraphs of this Complaint.

12.    Until November 10, 2025, McKendrick was the sole managing member and director of Aspire.

13.    McKendrick has served as the CEO and President of both Arrears and AIUG since they were formed.

14.    Eyeon and McKendrick initially entered into a business relationship in April 2012 when McKendrick personally guaranteed a loan in the amount of AU $150,000 that Eyeon issued to Skybridge Capital Pty Ltd ("Skybridge"). Said loan was required to be repaid in forty-five days. Skybridge and McKendrick breached the loan agreement and personal guarantee by failing to repay the loan. Skybridge was eventually deregistered on April 26, 2014.

15.    Beginning in November 2020, Eyeon began lending additional monies to McKendrick which eventually led to McKendrick being indebted to Eyeon in the amount of AU $715,000. Between November 2021 and January,2023, McKendrick and Eyeon entered into three additional loan agreements pursuant to which Eyeon loaned McKendrick the additional total sums of AU$430,918.20.

16. By March 2023, McKendrick had not repaid any of the aforementioned loans. In order to be compensated for the funds due to it, Eyeon entered into a new agreement with McKendrick and TJM Capital pursuant to which McKendrick's debt was converted into equity in Aspire being transferred to Eyeon.

17. On October 22, 2025, Eyeon and Northrock, among other members and stockholders of Aspire, Arrears and AIUG sent a letter to McKendrick requesting that he notice and call for a special meeting of members of Aspire and stockholders of Arrears and AIUG for the purpose of adding two additional directors to the board of directors for each of the three companies. McKendrick refused to send the letters.

18. On October 29, 2025, due to McKendrick's refusal to send the requested letter, Eyeon and Northrock, among other members of Aspire and stockholders of Arrears and AIUG, pursuant to Nevada and Delaware law, the Aspire operating agreement, Arrears' bylaws, and AIUG's bylaws, sent letters to all Aspire members and Arrears and AIUG stockholders stating that special meetings of members and stockholders would be held on November 10, 2025 for the purpose of considering whether to elect two additional directors for the board of directors of Aspire, Arrears and AIUG.

19. On November 10, 2025, at 4:00 pm, a special meeting of members of Aspire was conducted. At least nine members of Aspire were in attendance at the special meeting, including McKendrick and another twenty members who provided their proxies to Stephen Copulos. Before the motion to elect two additional directors was called, a number of members were given the opportunity to speak about their concerns about the mismanagement of Aspire and some of them discussed the fact that despite paying for membership units, they had never been issued their units.

20. In response to the numerous complaints registered by the various members attending the special meeting, McKendrick acknowledged his poor communication skills and stated that he would make Aspire's business records available for review.

21. Motions were made and seconded and both Eyeon and Northrock were elected as additional directors of Aspire with a vote in favor of the motion of 31,566,841 units and against of 7,600,000 units. Eyeon designated Dean Huge as its representative and Northrock designated Neil Cohen as its representative.

22. Following that vote, another motion was made to instruct the newly constituted board of directors to take whatever action was necessary for Aspire to be reinstated as an active Nevada limited liability company. This included filing the necessary documentation with the Nevada Secretary of State, paying the $1350.00 fee and penalty required by the Nevada Secretary of State, and designating a new registered agent for Aspire. In response to the motion, McKendrick claimed that he had already processed the paperwork to have Aspire reinstated. This was a lie. A review of the Nevada Secretary of State website confirmed that Aspire's status was still revoked at that time.

23. The vote to have Aspire reinstated passed by a vote of 31,566,841 units in favor and 7,600,000 units against the motion. The special meeting of Aspire members was then adjourned and the special meetings of the Arrears and AIUG stockholders were indefinitely postponed until a date to be determined later in the future,

24. A few days later, the necessary documentation and payment was submitted to the Nevada Secretary of State after which Aspire regained its active status as a Nevada limited liability company.

25. Since receipt of the Aspire equity from Defendants, despite the fact that Defendants had retained sole operating control over Aspire until at least November 10, 2025, when a special meeting of members was held after proper notice had been provided to all members, Plaintiffs have been subjected to the following by Defendants:

    (a) Defendants have failed to issue units to various members despite the fact that those members have already paid for their units.

    (b)    Defendants allowed Aspire's status as an active limited liability company to be revoked and it was not reinstated until new directors/managing members caused Aspire to be reinstated by the Nevada Secretary of State on November 12, 2025.

    (c)    Despite numerous requests by members, Defendants continue to refuse to comply with Section 10 of Aspire's operating agreement to provide accountings and financial records to its members.

    (d)    Defendants withhold members' access to any contracts entered into between Aspire and any third parties.

26.    Plaintiffs are informed and believe, and on that basis allege that Arrears was established for the purpose of providing AI-powered accounts receivable management and debt collection solutions for businesses.

27.    Plaintiffs are informed and believe, and on that basis allege that McKendrick improperly caused Aspire to issue himself preferred stock by failing to comply with Section 242 and other relevant statutes set forth in the Delaware General Corporations Law.

28.    In his capacity as Arrears' CEO, McKendrick failed to ensure that Arrears was authorized to conduct business in the State of California. In his capacity as CEO of Arrears, McKendrick was required to file annual statements of information for Arrears with the California Secretary of State's office by no later than June 30, 2024, and June 30, 2025. McKendrick has failed to do so, placing Arrears' ability to conduct business in California at risk.

29.    Aspire is the majority shareholder of Arrears. On November 17, 2025, a majority of stockholders of Arrears, which included Aspire, Eyeon and Northrock sent McKendrick a written consent approving the election of Dean Huge and Neil Cohen as additional directors of Arrears pursuant to Delaware Corporations law.

30.    Prior to sending that consent, McKendrick had sent a request to Eyeon and Northrock to consent to revising the Arrears bylaws to:

(a) Raise the threshold for calling special meetings to twenty-five percent (25%) of votes in Article II, Section 2.2 (including votes of Series A Convertible Preferred Stock on an as-if-converted basis at a 20:1 ratio)

(b) Require a supermajority (66%) for director removals and allowing board-filled vacancies in Article III, Sections 3.5 and 3.6.

(c) Authorizing the board to handle capital raises, stock issuances, and loans from directors/stockholders (including on terms beneficial to the lender if in the Corporation's interest) in Article V, Sections 5.5 and 5.6.

31. On November 14, 2025, Dean Huge, as the designated representative of Eyeon and Neil Cohen, as the designated representative of Northrock, both of which are newly elected directors of Aspire, sent a letter to McKendrick advising him that he had no authority to take the unilateral action of seeking consent for the aforementioned changes to the Arrears bylaws. They requested that he immediately advise all Arrears stockholders to whom he sent the consent that he was rescinding it immediately. On that same date, Stephen Copulos, as the majority shareholder of both Eyeon and Northrock sent McKendrick an email rejecting McKendrick's proposal as well.

32. Not only did McKendrick not advise Arrears stockholders that he was rescinding the request, but he attempted to unilaterally modify the Arrears bylaws in his alleged capacity as the sole director of Arrears in violation of Delaware law and the Arrears bylaws.

33. McKendrick has mismanaged and committed tortious acts against Arrears, subjecting Arrears stockholders to the following:

(a) Continued refusal to provide stockholders with accountings and financial records despite numerous requests.

(b) Failure to provide stockholders with access to any contracts entered into between Arrears and any third parties.

(c) Issued preferred stock to himself without properly seeking consent for

4929-9448-9211

doing so from any other stockholders in violation of Delaware law and Arrears bylaws.

(d)　　Claims to have amended the bylaws of Arrears in violation of Delaware General Corporations Law and Arrears bylaws.

34.　　Plaintiffs are informed and believe, and on that basis allege that AIUG was established for the purpose of providing AI-powered student loan management technology simplifying searching, applying for and repaying student loans.

35.　　McKendrick, in his capacity as President and the sole director of AIUG, placed AIUG's status as a publicly traded company on the OTC by failing to timely file a 10-K after filing a Notification of Late Filing ("NT 10-K"). Defendants filed a NT 10-K on April 1, 2025, so they should have filed AIUG's Form 10-K by no later than April 16, 2025. As of the date of filing this Complaint, McKendrick still has not filed the required Form 10-K and still has not completed any of the audits required for a publicly traded company.

36.　　On September 29, 2022, an entity known as Nest Egg Investments, LLC ("Nest Egg") of which McKendrick holds himself out as a director entered into a Stock Purchase Agreement with an entity known as Beyond Trade Securities Group Inc ("Beyond Trade") Pursuant to that agreement, Nest Egg was required to pay Beyond Trade $108,000. Nest Egg paid Beyond Trade a deposit of $20,000 and a subsequent payment of $50,000. No further payments were made by Nest Egg leaving an outstanding balance due to Beyond Trade of $38,000.

37.　　On December 4, 2024, an addendum No. 1 to the aforementioned Stock Purchase Agreement was entered into between Nest Egg and Beyond Trade. One of the terms of the Addendum was to replace Nest Egg as the purchaser of the Beyond Trade stock with AIUG. Pursuant to the terms of the Addendum, AIUG was required to establish a fund for initial operations with a minimum of $250,000 to cover expenses, staffing and other required investments. AIUG was also required to establish a physical office and hire a team of 3-5 staff members to begin running

Beyond Trade.

38. Not only did McKendrick fail to have AIUG establish the fund of a minimum of $250,000, establish a physical office and hire a team of 3-5 staff members, but he made himself entirely unavailable and inaccessible to the principals of Beyond Trade to accomplish the transition of Beyond Trade to AIUG.

39. McKendrick has mismanaged and committed tortious acts against AIUG, subjecting AIUG stockholders to the following:

(a) Continued refusal to provide stockholders with accountings and financial records despite numerous requests.

(b) Failure to provide stockholders with access to any contracts entered into between Arrears and any third parties.

(c) Failure to comply with securities laws by failing to secure annual audits for AIUG.

(d) Failure to pay certain employees who resigned or whose services he terminated. Final paychecks or additional monies are allegedly owed to these former employees, subjecting AIUG to claims.

(e) Exposed AIUG to claims of breach of contract and fraud by the principals of Beyond Trade.

40. Since gaining control of Aspire, Arrears and AIUG as CEO for each company, McKendrick has gained access to over fifty million dollars in capital raised from investors in the three companies. Plaintiffs are informed and believe and, on that basis, allege that McKendrick has misappropriated funds from the three companies for the purpose of maintaining his extravagant lifestyle. Plaintiff is informed and believes, and on that basis alleges that McKendrick has used misappropriated funds from Aspire, Arrears, and AIUG to pay for his personal expenses and items, including but not limited to the following: by paying for:

(a) Four luxury vehicles all acquired in January 2025.

(b) Multimillion dollar homes, rented for himself and family members.

(c) Expensive jewelry and other forms of personal property.

(d) Travel to various locations and extravagant accommodations at those locations.

(e) Financial support to family members and companions to fund their extravagant lifestyles.

(f) Acquisition of illegal and illicit drugs.

## FIRST CLAIM FOR RELIEF

## ON BEHALF OF ASPIRE, ARREARS AND AIUG

### (Breach of Fiduciary Duty)

41. Plaintiffs incorporate by reference each and every allegation contained in the preceding paragraphs of this Complaint.

42. As the CEO and the sole director of Arrears, Aspire, and AIUG, McKendrick owed a fiduciary duty to Aspire, Arrears and AIUG and all of the shareholders of Arrears and AIUG and all of the members of Aspire.

43. McKendrick breached his fiduciary duty to Aspire, Arrears and AIUG and all of the shareholders of Arrears and AIUG and all of the members of Aspire by:

(a) Misappropriating funds belonging to those companies for his own personal use.

(b) Refusing to provide stockholders and members with accountings and financial records despite numerous requests.

(c) Failing to provide stockholders and members with access to any contracts that Aspire, Arrears, or AIUG entered into with third parties.

(d) Issuing preferred stock to himself without properly seeking consent for doing so from any other stockholders in violation of Delaware law and Arrears bylaws.

(e) Claiming to have unilaterally amended the bylaws of Arrears which violates Delaware General Corporations Law and Arrears bylaws.

4929-9448-9211

(f) Continuing to mismanage Aspire, Arrears, and AIUG by not filing the proper documentation with various state and federal agencies.

44. By committing the aforementioned breaches of fiduciary duty McKendrick has placed the very survival of Aspire, Arrears and AIUG at risk.

45. As a result of McKendrick's breaches of fiduciary duty that he owes to Aspire, Arrears and AIUG, each their shareholders or members have been damaged in an amount of no less than $25,000,000 with the exact amount to be proven at time of trial.

46. In engaging in the acts alleged in this Complaint, McKendrick acted oppressively and maliciously, with conscious disregard for Plaintiffs and with intent to injure Plaintiffs' businesses, thereby entitling Plaintiffs to punitive damages in an amount sufficient to punish Cross-Defendants and deter them and others similarly situated from repeating like acts in the future.

## SECOND CLAIM FOR RELIEF
## ON BEHALF OF ASPIRE, ARRERS AND AIUG
### (Conversion)

47. Plaintiffs incorporate by reference each and every allegation contained in the preceding paragraphs of this Complaint.

48. Since gaining control of Aspire, Arrears and AIUG as the three company's CEO, McKendrick has gained access to over one hundred million dollars in capital raised from investors in the three companies.

49. Plaintiffs are informed and believe and, on that basis, allege that McKendrick has misappropriated funds from the three companies for the purpose of maintaining his extravagant lifestyle. Plaintiff is informed and believes, and on that basis alleges that McKendrick has used misappropriated funds from Aspire, Arrears, and AIUG to pay for his personal expenses and items, including but not limited to the following: by paying for:

(a) Four luxury vehicles all acquired in January 2025.

(b) Multimillion dollar homes, rented for himself and family members.

(c) Expensive jewelry and other forms of personal property.

(d) Travel to various locations and extravagant accommodations at those locations.

(e) Financial support to family members and companions to fund their extravagant lifestyles.

(f) Acquisition of illegal and illicit drugs.

50. Despite repeated demands that McKendrick provide Plaintiffs with accountings and financial records of Aspire, Arrears and AIUG in order to substantiate that he has not misappropriated funds from any of the three companies, McKendrick has consistently refused to turnover any accountings or financial records.

51. McKendrick has exercised dominion, and control over assets belonging to Aspire, Arrears and AIUG by converting those assets for his personal use.

52. As a result of McKendrick's acts of conversion over assets belonging to Aspire, Arrears and AIUG, Aspire, Arrears and AIUG and their shareholders and members have been damaged in an amount no less than $25,000,000 with the exact amount to be proven at time of trial.

53. In engaging in the acts alleged in this Complaint, McKendrick acted oppressively and maliciously, with conscious disregard for Plaintiffs and with intent to injure Plaintiffs' businesses, thereby entitling Plaintiffs to punitive damages in an amount sufficient to punish Cross-Defendants and deter them and others similarly situated from repeating like acts in the future.

### THIRD CLAIM FOR RELIEF
### BY EYEON DIRECTLY
### (Fraud)

54. Plaintiffs incorporate by reference each and every allegation contained in the preceding paragraphs of this Complaint.

4929-9448-9211

55. In July 2025, Stephen Copulos ("Copulos"), Copulos the President of Eyeon and Northrock, along with one of his business associates, Robert Hamilton ("Hamilton") traveled from Australia to Los Angeles for the purpose of meeting with McKendrick and reviewing business and financial records of Aspire, Arrears and AIUG.

56. Between July 9 and July 11, 2025, Copulos and Hamilton met with McKendrick in Los Angeles. During some of those meetings, Copulos and Hamilton introduced McKendrick to Boroda Holm, a full service Certified Public Accounting firm, which Copulos and Hamilton had retained for the purpose of reviewing the financial and business records of Aspire, Arrears and AIUG.

57. During one of the meetings, McKendrick represented to Copulos and Hamilton that Aspire, Arrears and AIUG required additional capital. McKendrick represented that he would permit Boroda Holm to audit Aspire, Arrears, and AIUG's business and financial records if Copulos through Eyeon invested an additional $750,000 into Arrears and an additional $100,000 into Aspire. Based upon McKendrick's representations, Eyeon invested the requested funds. Eyeon acted reasonably in relying upon McKendrick's representation as it appeared that McKendrick was willing to allow Boroda Holm to perform the requested audit.

58. None of the representations made by McKendrick were true. Two days after Copulos and Hamilton returned to Australia, McKenna fired Boroda Holm. A few days later, McKendrick fired AIUG's bookkeeper, Esther Park, after she questioned him about suspicious financial information she discovered. Eyeon and Northrock did not discover that Park had been fired by McKendrick until a few months later. Also, since Copulos and Hamilton returned to Australia, Copulos has requested, on behalf of Aspire, Arrears and AIUG, that McKendrick provide access to the companies' financial and business records. McKendrick continues to refuse to do so.

59. When McKendrick made the aforementioned representations to

1 Copulos and Hamilton, he knew that they were not true and that he never intended to allow any third party engaged for the benefit of Aspire, Arrears and AIUG to review the business and financial records of the companies. Also, Plaintiffs are informed and believe, and upon that ground allege that McKendrick knew that the additional investment made by Eyeon in Arrears in the amount of $750,000 and $100,000 in Aspire would not be used for the benefit of Arrears or Aspire, but for his own personal benefit.

60. If Eyeon knew of McKendrick's true intent, it would not have caused another $750,000 to be invested in Arrears and another $100,000 in Aspire.

61. As a result of McKendrick's fraudulent acts committed against Eyeon and Northrock it has been damaged in an amount no less than $25,000,000 with the exact amount to be proven at time of trial.

62. In engaging in the acts alleged in this Complaint, McKendrick acted oppressively and maliciously, with conscious disregard for Eyeon and with intent to injure Eyeon, thereby entitling Eyeon to punitive damages in an amount sufficient to punish Cross-Defendants and deter them and others similarly situated from repeating like acts in the future.

**FOURTH CLAIM FOR RELIEF**

**FOR NEGLIGENT MISREPRESNTATION BY EYEON DIRECTLY**

**(Negligent Misrepresentation)**

63. Plaintiffs incorporate by reference each and every allegation contained in the preceding paragraphs of this Complaint.

64. In July 2025, Copulos and Hamilton traveled from Australia to Los Angeles for the purpose of meeting with McKendrick and reviewing business and financial records of Aspire, Arrears and AIUG.

65. Between July 9 and July 11, 2025, Copulos and Hamilton met with McKendrick in Los Angeles. During some of those meetings, Copulos and Hamilton introduced McKendrick to Boroda Holm, a full service Certified Public Accounting

1  firm, which Copulos and Hamilton had retained for the purpose of reviewing the
2  financial and business records of Aspire, Arrears and AIUG.

3        66.    During one of the meetings, McKendrick represented to Copulos and
4  Hamilton that Aspire, Arrears and AIUG required additional capital. McKendrick
5  represented that he would permit Boroda Holm to audit Aspire, Arrears, and AIUG's
6  business and financial records if Copulos through Eyeon invested an additional
7  $750,000 into Arrears and an additional $100,000 into Aspire. Based upon
8  McKendrick's representations, Eyeon and invested the requested funds. Eyeon acted
9  reasonably in relying upon McKendrick's representation as it appeared that
10 McKendrick was willing to allow Boroda Holm to perform the requested audit.

11       67.    None of the representations made by McKendrick were true. Two days
12 after Copulos and Hamilton returned to Australia, McKenna fired Boroda Holm. A
13 few days later, McKendrick fired AIUG's bookkeeper, Esther Park, after she
14 questioned him about suspicious financial information she discovered. Eyeon and
15 Northrock did not discover that Park had been fired by McKendrick until a few
16 months later. Also, since Copulos and Hamilton returned to Australia, Copulos has
17 requested, on behalf of Aspire, Arrears and AIUG, that McKendrick provide access
18 to the companies' financial and business records. McKendrick continues to refuse to
19 do so.

20       68.    When McKendrick made the aforementioned representations to
21 Copulos and Hamilton, he should have known that they were not true and that he
22 never intended to allow any third party to be engaged for the benefit of Aspire,
23 Arrears and AIUG to review the business and financial records of the companies.
24 Also, Eyeon is informed and believes and upon that ground allege that McKendrick
25 should have known that the additional investment made by Eyeon in Arrears in the
26 amount of $750,000 would not be used for the benefit of Arrears and $100,000 for
27 the benefit of Aspire, but for his own personal benefit.

28       69.    If Eyeon knew of McKendrick's true intent, Eyeon would not have

caused an additional $750,000 invested in Arrears and another $100,000 invested in Aspire.

70. As a result of McKendrick's negligent misrepresentations committed against Eyeon, it has been damaged in an amount no less than $25,000,000 with the exact amount to be proven at time of trial.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of Aspire, Arrears and AIUG requests that the Court enter judgment against Defendants as follows:

*For the claims of breach of fiduciary duty, and conversion*:

71. Compensatory Damages in the amount of no less than $25,000,000 with the exact amount to be proven at time of trial.

72. Punitive damages in an amount sufficient to punish Defendants and deter them and others similarly situated from repeating like acts in the future.

73. Injunctive relief against Defendants enjoining them from taking any further action against Aspire, Arrears and AIUG that would cause any of those entities irreparable harm.

WHEREFORE, Eyeon requests that the Court enter judgment against Defendants as follows:

*For the claim of fraud being brought directly by Eyeon against Defendants:*

74. Compensatory Damages in the amount of no less than $25,000,000 with the exact amount to be proven at time of trial.

75. Punitive damages in an amount sufficient to punish Defendants and deter them and others similarly situated from repeating like acts in the future.

*For the claim of negligent misrepresentation being brought directly by Eyeon against Defendants:*

76. Compensatory Damages in the amount of no less than $25,000,000 with the exact amount to be proven at time of trial.

*For all Causes of Action:*

77. For pre-judgment and post-judgment interest at the legal rate.

78. For costs, expert fees, and attorneys' fees as allowed by law; and

79. For any other relief the Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a jury trial on each and every claim set forth herein.

Dated: November 25, 2025        SNELL & WILMER L.L.P.

By: _____
Keith M. Gregory
Aliya L. Astaphan

Attorneys for Plaintiffs
Eyeon Investments Pty Ltd. and Northrock Capital Pty Ltd on behalf of Aspire Technologies, LLC, Arrears, Inc and AI Unlimited Group, Inc. and Eyeon Investments Pty Ltd and Northrock Capital Pty Ltd directly